United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JASON DORTON,

        Petitioner,

  v.

KATHLEEN DICKINSON, Warden

        Respondent.

                           /

No. C 98-2003 MMC

**ORDER DENYING FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

17

18

19

20

21

      Before the Court is petitioner Jason Dorton's ("Dorton") First Amended Petition for Writ of Habeas Corpus ("FAP"), filed June 11, 1998.[1]  Respondent Kathleen Dickinson has filed an answer and a memorandum of points and authorities in support thereof; petitioner has filed a traverse and a reply memorandum.  Having read and considered the parties' respective written submissions,[2] the Court rules as follows.

22

**BACKGROUND**

23

24

      On November 17, 1994, a jury in the Superior Court, in and for the County of Contra

25

26

[1]The FAP was dismissed by order filed December 28, 1998.  On February, 1, 2010, the Court granted petitioner's unopposed Motion to Reinstate.

27

28

[2]On May 24, 2010, Dorton filed a motion for an evidentiary hearing, and respondent filed an opposition thereto.  By order filed June 23, 2010, the Court denied the motion as premature.  To the extent the parties' respective submissions in support of and in opposition to said motion include argument pertaining to the merits of Dorton's claims, the Court has considered those arguments in connection with its determination herein.

1   Costa, found Dorton and co-defendant Kevin L. Phelps ("Phelps") guilty of the murder of

2   Mark Crosby ("Crosby") (see Clerk's Transcript ("CT") 379, 382);[3] two prior trials had

3   "ended in hung juries."  (See Ex. C at 1.)  At the November 1994 trial, the jury found Dorton

4   guilty of murder in the second degree and Phelps guilty of murder in the first degree; the

5   jury further found both Dorton and Phelps had personally used a firearm in the commission

6   of the murder.  (See CT 379-80, 382-83.)  The trial court thereafter found true the

7   allegations that Dorton and Phelps committed the murder with the specific intent to benefit

8   the unlawful conduct of a street gang.  (See CT 2, Reporter's Transcript ("RT") 1446.)[4]

9        On December 9, 1994, Dorton and Phelps jointly filed a motion for a new trial.  (See

10  CT 385.)  On January 6, 1995, the trial court denied the motion for a new trial and

11  sentenced Dorton to a term of 20 years to life in prison.  (See RT 1526; CT at 470-71).  The

12  California Court of Appeal subsequently affirmed the judgment (see Ex. C), and the

13  California Supreme Court denied Dorton's petition for review (see Ex. J).  The California

14  Court of Appeal also denied Dorton's petition for a writ of habeas corpus (see Ex. L), and

15  the California Supreme Court denied Dorton's petition for review (see Ex. N).

16                                    **LEGAL STANDARD**

17       This Court may entertain a petition for a writ of habeas corpus "in behalf of a person

18  in custody pursuant to the judgment of a State court only on the ground that he is in

19  custody in violation of the Constitution or laws or treaties of the United States."  See 28

20  U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

21       A district court may not grant a petition challenging a state conviction or sentence on

22  the basis of a claim that was reviewed on the merits in state court unless the state court's

23  adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an

24

25       [3]All transcripts and exhibits cited herein were filed by respondent on February 24,
26  2010 as exhibits to respondent's answer.

27       [4]During pretrial proceedings, the trial court granted Phelps' motion to bifurcate the
    trial such that the gang-enhancement allegation would be tried in a later phase (see RT
28  47:22-24, 54:11 - 56:20), and each defendant subsequently waived his right to a jury trial
    on that allegation (see RT 1350-59).

1  unreasonable application of, clearly established Federal law, as determined by the

2  Supreme Court of the United States; or (2) resulted in a decision that was based on an

3  unreasonable determination of the facts in light of the evidence presented in the State court

4  proceeding."  See 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

5  Additionally, habeas relief is warranted only if the constitutional error at issue had a

6  "substantial and injurious effect on the verdict."  See Penry v. Johnson, 532 U.S. 782, 796

7  (2001) (internal citation omitted).

8      A state court decision is "contrary to" clearly established Supreme Court precedent if

9  it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases"

10  or if it "confronts a set of facts that are materially indistinguishable from a decision of [the

11  Supreme] Court and nevertheless arrives at a result different from [its] precedent."  See

12  Williams, 529 U.S. at 405-06.  "Under the 'unreasonable application' clause, a federal

13  habeas court may grant the writ if the state court identifies the correct governing legal

14  principle from [the Supreme] Court's decision but unreasonably applies that principle to the

15  facts of the prisoner's case."  Id. at 413.  "[A] federal habeas court may not issue the writ

16  simply because that court concludes in its independent judgment that the relevant state-

17  court decision applied clearly established federal law erroneously or incorrectly.  Rather,

18  that application must also be unreasonable."  Id. at 411.

19      Section 2254(d)(1) restricts the source of clearly established law to the Supreme

20  Court's jurisprudence.  "[C]learly established federal law, as determined by the Supreme

21  Court of the United States" refers to "the holdings, as opposed to the dicta, of [the

22  Supreme] Court's decisions as of the time of the relevant state-court decision."  Id. at 412.

23  "A federal court may not overrule a state court for simply holding a view different from its

24  own, when the precedent from [the Supreme Court] is, at best, ambiguous."  Mitchell v.

25  Esparza, 540 U.S. 12, 17 (2003).

26      Here, the Court of Appeal, in its opinion on direct review (see Ex. C), addressed

27  some of the claims Dorton raises in the instant action.  The Court of Appeal thus was the

28  highest court to have reviewed those claims in a reasoned decision, and, as to those

3

1   claims, it is the Court of Appeal's decision that this Court reviews herein.  See Ylst v.

2   Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92

3   (9th Cir. 2005).  As to the claims for which there is no reasoned opinion available, the

4   United States Supreme Court has recently clarified that a federal habeas court, in applying

5   the review provisions of 28 U.S.C. § 2254(d), looks to the result reached by the highest

6   state court, and that the absence of reasoning does not prevent application of the standard

7   of review set forth in § 2254(d).  See Harrington v. Richter, 131 S. Ct. 770, 784-85 (2011).

8   **FACTUAL BACKGROUND**

9   The Court of Appeal set forth the factual background as follows:

10  On the afternoon of February 15, 1993, Crosby was visiting some people in a front
    yard on Lucas Street in Richmond, California.  Four men in a Peugeot pulled up and
11  accosted him.  Crosby immediately rode away on a bicycle and turned down
    Seventh Street.  The Peugeot proceeded to the corner of Seventh and Lucas,
12  where all four occupants began shooting at Crosby.  The driver and left rear
    passenger leaned out of their windows and the two passengers on the right side
13  fired over the roof of the car.  Crosby was hit in the back of the head and fell to the
    ground.
14
15  The police found 9 millimeter and .223 caliber shell casings at the scene of the
    crime.  Two 9 millimeter casings were located in the right front passenger area of the
16  Peugeot when the car was found parked on a Richmond street the day after the
    shooting.  Crosby's wound was most consistent with the kind of damage inflicted by
17  a high velocity bullet fired from a rifle.  A .223 caliber weapon could have inflicted the
    wound.  The police found a Big Five Sporting Goods receipt in the Peugeot for five
18  boxes of .223 ammunition.  The receipt was dated the day before the shooting.

19  The police recovered a Ruger P-85 semi-automatic pistol with a loaded magazine, a
    box of 9 millimeter ammunition, and a paper bag containing .223 ammunition in
20  searches of Phelps' residence.  The Ruger P-85 had fired the two 9 millimeter
    casings found in the Peugeot and six of the casings found at the crime scene.  The
21  .223 casings recovered at the scene had all been fired from one rifle, probably a
    Ruger mini-14.  Five of the .223 cartridges found in the paper bag had been
22  chambered in the same rifle but had not been fired.  That weapon had also fired
    casings found in a carport at another address where Phelps lived when police
23  responded to reports of gunfire on January 19, 1993.

24  The police performed a gunshot residue test on Dorton's hands on the evening of
    the shooting.  The test yielded a particle that could have been gunshot residue.
25  When Dorton was arrested at around 5 p.m. on the afternoon of the shooting, he
    said to Officer Ward of the Richmond Police Department, "Ward, man, we got to get
26  out of here.  They are saying that we killed Mark Crosby over on Seventh Street."
    Dorton denied knowing anything about the killing when interviewed at the police
27  station later that same [day].

28  An associate of [Dorton and Phelps] named Mondrell "Mooch" Johnson had rented
    the Peugeot from Troy Olsen in February 1993 in exchange for crack cocaine.

Phelps was present at the transaction.  Another associate of [Dorton and Phelps], Derrick Pride, was identified by a store clerk from Big Five Sporting Goods as one of four men who together had purchased the .223 ammunition the day before Crosby was shot.

[Dorton and Phelps] were identified by Jonathan Robinson as two of the shooters in the Peugeot.  Robinson was one of the persons Crosby had been visiting on Lucas Street just before the murder.  Robinson was unavailable at trial, but the prosecution read his testimony from the second trial to the jury.  The jury also saw a videotape of Robinson's interview with the police on the day Crosby was killed.

Robinson had gone to Crosby's aunt's house at Sixth and Lucas after the shooting, where he spoke to Officer Ward.  Robinson told Ward that Phelps had killed Crosby.  A short time later, Robinson picked Phelps and Dorton out of photo lineups.  Robinson testified Phelps was in the right front seat of the Peugeot and had asked Crosby, "What's happening?" when the car pulled up on Lucas Street.  Dorton was seated behind the driver.  (In his initial interview with the police, Robinson described the person behind the driver as dark-skinned, but in court he said he had described him as light-skinned.  Dorton is a light-skinned African-American.)[5]  Robinson did not recognize the other two occupants.  However, a few days later Phelps's brother Lee was shot to death and Robinson called the police to tell them he had seen Lee's picture in the newspaper.  He told the police he recognized Lee Phelps as the right rear passenger in the Peugeot.

Robinson confirmed his identification of Dorton and Phelps at trial.  He said Phelps had used "some type of assault weapon," and the others had used 9 millimeter weapons.  All the weapons were handguns.  Phelps was wearing a white baseball cap turned backwards and Dorton a black ski mask and black jacket.  Dorton was wearing a black jacket when he was arrested on the evening of the shooting, and Robinson identified the jacket as the one Dorton had on during the shooting.  Robinson knew Crosby from having worked with him in a barber shop, and knew [Dorton and Phelps] from the neighborhood.  Phelps had robbed him once.

Robinson was reluctant to testify because he and his family had been threatened.  (The judge instructed the jury that Robinson's testimony about threats was not offered for the truth of the matter but only to show Robinson's state of mind.)  A half-brother of Robinson's was killed about six months after Crosby's death and several people told Robinson he was the intended target.  At that point Robinson approached the police and asked for help.  They gave him $800 to relocate, and he went to Texas.  Robinson had not appeared at the first trial and was in court for the second only because he had been arrested.  He claimed to have met Phelps in the court holding cell where Phelps offered him money or drugs not to testify.  Robinson admitted felony convictions for narcotics sales and possession of a weapon by a felon and [that he] was on probation for possession of stolen property.

The prosecution's theory was that Mark Crosby's murder was part of a feud between a group associated with Third and Main[e] Streets and a group associated with the Parchester neighborhood.  [Dorton and Phelps] belonged to the Third and Main[e] group.  Mark Crosby belonged to the Parchester group.  Harold Oliver of Third and Main[e] was murdered in late 1991, and members of the Parchester group were the

---

[5] "Although Robinson initially misdescribed Dorton's skin tone, he positively identified both [Dorton and Phelps] in photo lineups on the day of the shootings and maintained that identification in his trial testimony."  (See Ex. C at 10.)

1   suspected perpetrators.  In June 1992, Derrick Brice of Third and Main[e] shot Mark
2   Crosby and Terrain Miller of Parchester.  Brice was himself shot twenty minutes
    later.  A few weeks after that Amad Sahn of Parchester shot John Wayne Foutenot
3   of Third and Main[e].  On February 6, 1993, Craig Bowen of Third and Main[e] drove
    by a memorial service for a murdered Parchester associate and made a gesture of
4   some sort, possibly with a firearm.  Later that day Mark Crosby's brother Anthony
    fired shots at the Phelps residence, held a gun to the head of Kevin Phelps' cousin
5   Rachelle, and threatened to kill her.  Nine days later, Mark Crosby was killed, and
    three days after that Lee Phelps was killed.

6   [Dorton and Phelps] presented an alibi defense.  Defense witnesses testified [Dorton
7   and Phelps] were at Third and Main[e] on the corner or in a nearby apartment when
    Mark Crosby was murdered.

8   (See Ex. C at 1-5.)

9                                    **DISCUSSION**

10         Dorton argues he is entitled to habeas relief on two grounds.  The Court considers

11   each in turn.

12   **A.  Denial of Motion for New Trial**

13         As noted, after the jury found him guilty of murder, Dorton, joined by Phelps, filed a

14   motion for a new trial.  In the motion, Dorton argued a new trial was necessary in light of

15   "newly-discovered evidence," specifically, statements from Edward Lee Turner ("Turner"),

16   an alleged witness to the murder, which statements, according to Dorton, "directly

17   contradict[ed] those offered at trial by Robinson."  (See CT at 385, 387.)[6]  On January 6,

18   1995, the trial court denied the motion, finding Turner's version of the facts "taxe[d]

19   credulity."  (See CT at 434-35.)  The California Court of Appeal affirmed, finding "a new trial

20   was properly denied based on the improbability of a different outcome resulting from

21   Turner's testimony."  (See Ex. C at 10.)[7]

22

23   _____

24         [6]Dorton, in support of the motion, offered a declaration from Turner, in which Turner
     stated he was an eyewitness to the shooting, that he did not recognize any of the shooters
     at that time, and that when he met Phelps approximately twenty months thereafter, he
25   became "absolutely positive" that Phelps was not one of the shooters.  (See CT at 390-94.)
     Additionally, Turner testified at an evidentiary hearing conducted by the trial court in
26   conjunction with the motion for new trial, at which time he was shown Dorton's hands, and
     testified the hands of the person who was shooting from the left rear of the vehicle were
27   "considerably darker" than Dorton's hands.  (See RT at 1488:18 - 1489:11.)

28         [7]The California Court of Appeal's decision of October 28, 1996 is the last reasoned
     decision addressing Dorton's claim based on Turner.

1    In his FAP, Dorton argues the California Court of Appeal's determination deprived

2    him of due process, because, Dorton asserts, if Turner's testimony were given at a new

3    trial, the new trial would "probably" result in a "verdict of not guilty or a jury deadlock."  (See

4    FAP M-3:11-18.)

5    "[R]elief may not be granted [under § 2254] unless the state court adjudication

6    'resulted in a decision that was contrary to . . . clearly established Federal law, as

7    determined by the Supreme Court of the United States'."  See Bobby v Mitts, 131 S. Ct.

8    1762, 1763 (2011) (quoting 28 U.S.C. § 2254(d)(1)).  "[I]t is the habeas applicant's burden

9    to show that the state court applied [clearly established federal law] to the facts of his case

10   in an objectively unreasonable manner."  Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

11   Here, Dorton cites no Supreme Court law supporting his argument that his due

12   process rights were violated by the state court's denial of his motion for a new trial.  Indeed,

13   there is no such authority.  Rather, as the Supreme Court has observed, "[c]laims of actual

14   innocence based on newly discovered evidence have never been held to state a ground for

15   federal habeas relief absent an independent constitutional violation occurring in the

16   underlying state criminal proceeding," see Herrera v. Collins, 506 U.S. 390, 400 (1993),

17   such as, for example, "ineffectiveness of [trial] counsel" or "withholding of evidence by the

18   prosecution," see Schlup v. Delo, 513 U.S. 298, 314 (1995).  Dorton makes no argument

19   that Turner's testimony was not offered because of ineffectiveness on the part of trial

20   counsel,[8] misconduct by the prosecution, or any other circumstance that would establish an

21   independent constitutional violation.  Consequently, his claim does not implicate clearly

22   established law as determined by the Supreme Court.

23   Accordingly, Dorton fails to show he is entitled to habeas relief on this claim.

24   //

25   //

26   //

27   _____

28      [8]As discussed below, Dorton does assert his counsel was ineffective in not calling
     certain other individuals as witnesses.

7

**B.  Ineffective Assistance of Counsel**

Dorton alleges that his trial counsel provided ineffective assistance.  Specifically, Dorton asserts his trial counsel was ineffective in failing to call certain individuals as witnesses, in failing to object to the introduction of certain evidence, and in failing to object to certain statements made by the prosecution during closing arguments.

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components."  Strickland v. Washington, 466 U.S. 668, 687 (1984).  "First, the defendant must show that counsel's performance was deficient."  Id.  "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Id.  "Second, the defendant must show that the deficient performance prejudiced the defense."  Id.  "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable."  Id.

**1.  Not Calling Three Witnesses**

In his FAP, Dorton alleges his trial counsel was ineffective in not calling three individuals as witnesses.  In support thereof, Dorton relies on declarations provided by each of said individuals:  (1) Carolyn Sample ("Sample"), who states she witnessed the murder, and that, when she was later shown a picture of Dorton by Dorton's brother, she did not recognize Dorton as one of the persons in the Peugeot from which she saw shots being fired; (2) Willis Alcutt, Jr. ("Alcutt"), who states that on the day of the murder, he and Dorton had been standing on a street corner for a while, when three persons in a Peugeot drove up and claimed to have just shot someone; and (3) Terrence Williamson ("Williamson"), who states he was with Alcutt and Dorton when the above-referenced Peugeot drove up, and that earlier in the day while he was working on the brakes of a car, Dorton had touched the drum and did not wash his hands.[9]

---

[9]The declarations were filed in support of Dorton's state habeas petition.

8

1    The California Court of Appeal denied relief on this claim, finding Dorton had failed

2  to show that, had the testimony of Sample, Alcutt, and/or Williamson been offered, there

3  was "a reasonable probability of a more favorable outcome."  (See Ex. L.)[10]  Although not

4  clearly articulated in the FAP, Dorton appears to argue that the Court of Appeal's

5  determination constitutes an unreasonable application of Strickland's prejudice

6  requirement.  Irrespective of the reasonableness of the California Court of Appeal's

7  determination as to the issue of prejudice, however, Dorton fails to show he is entitled to

8  relief, because he fails to demonstrate that any of said individuals did not testify as a result

9  of deficient performance by trial counsel.

10    With respect to Sample and Alcutt, Dorton fails to offer any evidence to support a

11  finding that trial counsel was aware, or, in the exercise of reasonable diligence, should

12  have been aware, of either Sample or Alcutt at any time prior to the jury's verdict.  See

13  Earp v. Cullen, 623 F.3d 1065, 1077-78 (9th Cir. 2010) (holding trial counsel not ineffective

14  in not contacting four named individuals while preparing for trial, where "there [was] no

15  evidence in the record that trial counsel knew, or should have known, of [defendant's]

16  relationship with [them]"), cert. denied, 131 S. Ct. 2966 (2011).

17    With respect to Williamson, the record includes evidence, specifically, Williamson's

18  declaration, that Dorton's trial counsel spoke to Williamson prior to the trial and told

19  Williamson he would not call him as a witness because, in Williamson's words, Williamson

20  "had a criminal record."  (See Williamson Decl., attached to Ex. K, ¶ 7.)[11]  Dorton points out

21  that the prosecution's key eyewitness, Robinson, had a criminal record, and concludes his

22  counsel's failure to call Williamson because of Williamson's criminal record constituted

23  deficient performance.  Dorton, however, fails to offer sufficient evidence to support a

24  finding that his counsel's decision was "not supported by a reasonable strategy."  See

25

26    [10]The California Court of Appeal's decision of February 4, 1997 is the last reasoned
    decision addressing Dorton's claim based on Sample, Alcutt, and Williamson.

27

28    [11]Because the California Court of Appeal denied the petition for a writ of habeas
    corpus without requesting a response by the State, Dorton's evidence is uncontroverted.

1   <u>Massaro v. United States</u>, 538 U.S. 500, 505 (2003) (holding defendant alleging ineffective

2   assistance of counsel has burden to show "counsel's actions were not supported by a

3   reasonable strategy").

4           In particular, the record indicates that a primary strategy used at trial by Dorton was

5   to focus on challenging Robinson's credibility.  Indeed, in accord with that strategy, the

6   majority of the closing argument made by counsel for the co-defendant consisted of a

7   vigorous challenge to Robinson's credibility, which argument was based in large part on

8   Robinson's criminal record.[12]  (<u>See</u>, <u>e.g.</u>, RT 1274 ("Robinson is a drug dealing, gun toting,

9   stolen property dealer who manipulates the system and then breaks his promises.").)  Such

10  strategy could well have been undercut if Dorton had offered in his own behalf a witness

11  who himself had a criminal record.  At a minimum, it is "at least arguable" that a reasonable

12  attorney would have determined that offering Williamson's testimony might well have

13  undermined a major focus of the defense, specifically, that the prosecution's primary

14  witness was not credible in light of his criminal record.  See <u>Harrington</u>, 131 S. Ct. at 788

15  (holding that where it is "at least arguable" trial counsel's conduct was not deficient, federal

16  petitioner not entitled to habeas relief on claim of ineffective assistance of counsel).

17          Accordingly, to the extent Dorton's ineffective assistance claim is based on trial

18  counsel's not calling Sample, Alcutt, and Williamson as witnesses, Dorton fails to show he

19  is entitled to habeas relief.

20          **2.  Testimony Concerning Photographic Lineups**

21          In his FAP, Dorton claims his trial counsel was ineffective because of the manner in

22  which counsel objected to certain testimony given by Sergeant Michael Gormley ("Sgt.

23  Gormley"), the primary investigator assigned to the case, about photographic lineups.

24          During the prosecution's case in chief, the prosecutor asked Sgt. Gormley what

25

26          [12]Phelps and Dorton offered a joint defense at trial.  Phelps' counsel made his
    closing argument prior to Dorton's counsel, and when Dorton's counsel began his closing
27  argument, he indicated to the jury he would not address Robinson's testimony because
    such testimony had already been "covered extensively" by Phelps' counsel.  (<u>See</u> RT
28  1291.)

                                                    10

1  procedure he had followed when he prepared the photographic lineups he showed to

2  Robinson.  Sgt. Gormley answered as follows:  "What I did was . . . you get six

3  photographs of similar appearing males.  On each one of these photographic lineups there

4  is someone known to me to be a member of the Third & Main[e] Gang.  What I did, I got

5  five other persons - - -."  (See RT 531:22 - 532:1.)  At that point, counsel for Dorton

6  interrupted the testimony and stated:  "Object, and ask that be stricken.  The last remark

7  about the Third & Main[e] Gang."  (See RT 532:2-3.)  Before ruling on the objection, the

8  trial court questioned Sgt. Gormley and allowed the prosecutor to ask clarifying questions,

9  in response to which Sgt. Gormley testified he had obtained "information" that the "Third

10  and Main[e] boys" were "involved" in the shooting and that he had "predicated [his]

11  decision" to compile the lineups in the manner he did in light of such information.  (See RT

12  532:18-26.)  The trial court then overruled the objection.  (See RT 532:27-28.)[13]

13      In his FAP, Dorton contends the objection made by his counsel was insufficient.  As

14  Dorton explains in his state habeas petition, counsel did not make specific objections based

15  on "hearsay, violation of the Confrontation Clause, opinion, or lack of personal knowledge,"

16  but, rather, only to the use of the word "gang."  (See Ex. M at 9.)[14]

17      Dorton, however, points to no evidence in the record to support his assertion that the

18  scope of his counsel's objection was limited to Sgt. Gormley's use of the word "gang," or

19  that the trial court understood the objection as being so limited.  Under such

20  circumstances, the California Supreme Court reasonably could have concluded that Dorton

21  failed to meet his burden to demonstrate that the manner in which the objection was made

22  constituted an "error[ ] so serious that counsel was not functioning as the 'counsel'

23

24  _____

25      [13]A short time thereafter, Sgt. Gormley testified that he showed Robinson a
    photographic lineup that included a photograph of Dorton, and that Robinson "immediately"
26  identified Dorton.  (See RT 536:25 - 537:4-7).

27      [14]As discussed in greater detail below, the trial court, later in the proceedings,
    precluded the prosecution from eliciting the word "gang" from another police witness and
28  instructed that witness to use the word "group."  No such ruling had been made, however,
    at the time Sgt. Gormley gave the above-referenced testimony.

11

1    guaranteed the defendant by the Sixth Amendment."  See Strickland, 466 U.S. at 687.[15]

2         Further, the California Supreme Court reasonably could have found, even if it

3    assumed the objection was limited to the Sgt. Gormley's use of the word "gang," that

4    counsel for Dorton had a tactical reason for not objecting to the testimony on grounds

5    challenging, in effect, whether Sgt. Gormley had personal knowledge as to Dorton's

6    membership in a gang.  Dorton points to nothing in the record to suggest Sgt. Gormley

7    could not have provided facts to support his testimony that Dorton was a member of the

8    Third & Maine Gang, and counsel for Dorton may well have determined that Dorton's

9    defense would not have been advanced by having Sgt. Gormley so testify.

10        Accordingly, to the extent Dorton's ineffective assistance claim is based on the

11   manner in which his counsel objected to Sgt. Gormley's testimony concerning his

12   preparation of photographic lineups, Dorton fails to show he is entitled to habeas relief.

13        **3.  Testimony By Officer Ward**

14        At trial, the prosecution offered the testimony of Ron Ward ("Officer Ward"), who, at

15   the time of the murder and the subsequent investigation, was a police officer with the City

16   of Richmond.  Prior to trial, the prosecution had planned to qualify Officer Ward as a gang

17   expert and to offer his testimony to support, inter alia, the allegation that Dorton and

18   Phelps had committed the murder with the specific intent to benefit the unlawful conduct of

19   a street gang.  As discussed above, however, see n. 4, the trial court, over the

20   prosecution's objection, granted Phelps' motion to bifurcate the proceedings, such that the

21   enhancement allegation would be considered in a second phase.  In so ruling, the trial

22   court nonetheless agreed with the prosecution that evidence bearing on the defendants'

23   membership in a gang and the victim's membership in a rival gang would be admissible in

24

_____

25        [15]The California Supreme Court, the only state court to consider the merits of such
     claim and all other remaining claims addressed herein, denied said claims without setting
26   forth its reasoning.  (See Ex. N.)  Under such circumstances, "a habeas court must
     determine what arguments or theories . . . could have supported [ ] the state court's
27   decision," and "ask whether it is possible fairminded jurists could disagree that those
     arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]
28   Court."  See Harrington, 131 S. Ct. at 786.

1   the first phase to demonstrate motive.

2       During her opening statement, the prosecutor told the jury it would hear testimony

3   from Officer Ward, a "gang expert" who would be "giving [the jury] his opinions." (See RT

4   138:22-24.)  Although counsel for Phelps immediately asked that the prosecution be

5   "cautioned" in light of the trial court's pretrial order limiting the scope of the first phase, the

6   trial court declined to do so, stating the prosecution's description of the proposed evidence

7   was "within the ambit" of what would be allowed. (See RT 138:25 - 139:3.)  Later in the

8   trial, on the morning of the day the prosecution was planning to call Officer Ward, the trial

9   court inquired of the prosecutor, outside the presence of the jury, "exactly what [she]

10  propose[d] to ask" Officer Ward. (See RT 730:9-15.)  The prosecutor stated that Officer

11  Ward, in addition to testifying about his role in the investigation of the shooting, would "give

12  his qualifications in the area of investigation of gangs." (See RT 730:16-25.)  When

13  counsel for Phelps objected to evidence of "gang membership" being admitted in the first

14  phase, the trial court ruled that Officer Ward could not use the word "gang." (See RT

15  738:1-2 ("I'm concerned about the word gang.  I don't want that to be used.").)  The

16  prosecution then indicated that Officer Ward would use the word "group," and would testify

17  that "this particular murder was a result of a feuding between [ ] two groups and go into the

18  history of this feuding." (See RT 738:3-9.)  The trial court indicated such testimony would

19  be admissible, explaining: "[T]here is nothing wrong to show that there has been a group

20  discourse of some kind.  Animosity and fights.  Or arguments or disagreements.  Those are

21  all motive factors." (See RT 739:1-3.)

22      During his direct testimony in the first phase, Officer Ward testified about his years

23  of experience investigating "local feuds between local groups" in Richmond. (See RT

24  848:5-850:11.)  He also testified he was aware of a "group" associated with Third and

25  Maine Streets, and identified by name ten individuals he associated with said group,

26  including Dorton and Phelps. (See RT 850:15-28.)  Additionally, he testified he was aware

27  of a "group" associated with Parchester, and identified by name eight individuals he

28  associated with said group, including Crosby, the homicide victim. (See RT 851:12-22.)

1   Further, when the prosecutor asked him whether, based on his "contacts with individuals in

2   the city" and on "information that [he] received either through police reports or someone

3   actually talking to [him]," he knew that the Third and Maine and the Parchester "groups"

4   had been "feuding," he answered, "Yes." (See RT 851:22-28.)  Officer Ward also testified

5   the two groups had been engaged in a feud that began in early 1991 and continued

6   through the time of the February 15, 1993 shooting of Crosby and the murder of a brother

7   of Phelps in late February 1993. (See RT 852:1 - 854:20.)

8        After the jury convicted Dorton and Phelps, the trial court conducted the second

9   phase and, at that time, found Officer Ward was qualified to give expert testimony.  The

10  trial court, after hearing additional testimony from Officer Ward, as well as considering

11  other evidence, found true the allegation that Dorton and Phelps committed the murder with

12  the specific intent to benefit the unlawful conduct of a street gang.

13       In his FAP, Dorton alleges his counsel provided ineffective assistance by failing to

14  object to Officer Ward's testimony, given on direct during the first phase, in which Officer

15  Ward identified members of the two "groups" and recounted the history of feuding between

16  the two groups.  Specifically, according to Dorton, his counsel was ineffective by not

17  objecting to such testimony on grounds of hearsay, improper lay opinion, violation of the

18  Confrontation Clause and lack of personal knowledge.  Dorton, in making such argument,

19  correctly observes that Officer Ward was not formally qualified as a gang expert in the first

20  phase of the trial.

21       As noted, counsel for Dorton's co-defendant successfully moved to bifurcate the

22  proceedings such that the gang enhancement allegations would be tried in a second

23  phase, and, further, successfully obtained an order precluding Officer Ward from using the

24  word "gang" during his testimony before the jury in the first phase.  As set forth above,

25  however, the trial court, after considering the prosecution's offer of proof as to Officer

26  Ward's proposed testimony, found his testimony regarding "groups" would be relevant to

27  the issue of motive.  Further, during the second phase of the trial, the trial court did qualify

28  Officer Ward as an expert, in light of Officer Ward's testimony that his opinions were based

14

1    on his personal observations and on his discussions with gang members, with other

2    individuals in the community, and with fellow police officers over the course of a number of

3    years working throughout the city of Richmond.  See, e.g., People v. Olguin, 31 Cal. App.

4    4th 1355, 1370 (1994) (holding "police officers testifying as gang experts present[ ] an

5    adequate foundation for their opinions where they base[ ] their testimony on personal

6    observations of and discussions with gang members as well as information from other

7    officers and the department's files").

8          Under such circumstances, the Supreme Court reasonably could have found

9    Dorton's counsel made a tactical decision not to object to Officer Ward's testimony on

10   hearsay or the other grounds identified by Dorton in his FAP.  In particular, the California

11   Supreme Court could have determined defense counsel had concluded that, if such an

12   objection were made and sustained, the prosecution likely would have sought to have

13   Officer Ward formally qualified as an expert in the first phase, thus making it difficult, if not

14   impossible, to avoid the word "gang," as well as risking the introduction of further damaging

15   testimony pertaining to Dorton, or about the dangers posed by gangs in general.[16]

16         Additionally, the Supreme Court reasonably could have found the failure to object

17   resulted in no prejudice, because the objection would have been overruled after the

18   prosecution laid the foundation for Officer Ward's expertise, as was done in the second

19   phase.  See Matylinsky v. Budge, 577 F.3d 1083, 1093-94 (9th Cir. 2009) (holding trial

20   counsel's failure to object to testimony is not deficient, where objection would have been

21   properly overruled), cert. denied, 130 S. Ct. 1154 (2010).

22         Accordingly, to the extent Dorton's ineffective assistance claim is based on a failure

23   to object to Officer Ward's testimony concerning "groups," Dorton fails to show he is

24   entitled to habeas relief.

25

26         [16]Indeed, during the second phase of the trial, which was heard by the court, the
27   prosecution, in seeking to formally qualify Officer Ward as a gang expert, elicited testimony
     about various "gang" courses and seminars Officer Ward had attended, as well as the fact
28   that he had been qualified as an "expert on the recognition of criminal street gangs" in other
     proceedings.  (See RT 1398-1400.)

### 4. Testimony About Gun's Use in Other Crime

At trial, Officer Steve Zeppa ("Officer Zeppa") testified that, subsequent to the investigation of Crosby's death, he investigated a May 1993 shooting of two police officers, that an individual named Daniel Wade ("Wade") had been arrested for the shooting, and that, while executing a search warrant in connection with said investigation, he recovered a weapon (see RT 328:14 - 329:11), which weapon was introduced into evidence as People's Exhibit 20 (see RT 330:18-21).  A firearm examination expert, Kenneth Fujii, described Exhibit 20 as an "AP-9 firearm" and testified that eight of the shell casings found at the scene of Crosby's murder had been fired from that particular AP-9 firearm.  (See RT 399:10-12, 25-26, 405:14-21.)  Later in the trial, Dan O'Malley ("O'Malley"), a prosecutor with the Contra Costa County District Attorney's Office, testified he had prosecuted a criminal action against Wade for assault against two police officers, that Exhibit 20 was the weapon involved in Wade's case, and that Wade, during the trial on the charges against him, testified he had possessed said weapon and had purchased it "on the street" after his home was burglarized in March 1993.  (See RT 482:19 - 485:28; 493:22-28.)[17]

In his FAP, Dorton contends his counsel was ineffective for not objecting, on grounds of relevance and as unduly prejudicial, to evidence that Officer Zeppa had investigated the shooting of two police officers and to evidence that Wade had been tried for assaulting those police officers.  Such references, Dorton argues, suggested to the jury that the gun used to shoot at Crosby was also used to shoot at two police officers, which, according to  Dorton, suggested that a connection existed between Dorton and Wade, when, in fact, there was no evidence of any such connection.

---

[17]No objection was made to O'Malley's testifying as to the above-referenced out-of-court statements by Wade.  Outside the presence of the jury, Wade had testified that he would "plead the Fifth Amendment" if he were asked any questions relating to the AP-9, after which the trial court found Wade was unavailable to testify.  (See RT 322:21 - 324:4, 325:24-25); Cal. Evid. Code § 1230 ("Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest . . . that a reasonable man in his position would not have made the statement unless he believed it to be true.").

16

1    Contrary to Dorton's claim, the evidence was relevant.  As noted, Dorton presented

2  a defense based on misidentification and alibi.  As further noted, Crosby was killed on

3  February 15, 1993, and the prosecution offered evidence that Exhibit 20, the AP-9, was

4  used to fire rounds at Crosby at the time he was killed.  By O'Malley's testimony, the

5  prosecution sought to rule out a defense that, in light of Wade's admission that he owned

6  the AP-9, Wade was the person who used the AP-9 to shoot at Crosby.  In particular,

7  O'Malley's testimony was offered to show that Wade did not obtain the AP-9 until after

8  Crosby had been killed.  Additionally, evidence showing the circumstances under which

9  Wade made his statement, specifically, an admission made in the course of a criminal trial

10 in which he was accused of a serious crime, was relevant to demonstrate the reliability of

11 such evidence.  Further, if the jury had not been advised that the AP-9 was recovered by

12 the police in the course of their investigating a different crime, the jury may have

13 mistakenly inferred that Wade was a suspect in the Crosby murder.  Lastly, Dorton's

14 contention that the reference to an assault on officers was unduly prejudicial likewise is not

15 supported by the record.  There was no suggestion by the prosecution, or by any

16 reasonable inference from the evidence, that Dorton was in any manner involved in that

17 later incident.

18    The California Supreme Court thus reasonably could have found the challenged

19 evidence was relevant and not unduly prejudicial, and, consequently, that the failure to

20 object to such evidence did not constitute deficient performance.  See Matylinsky, 577 F.3d

21 at 1094.  Any such findings by the California Supreme Court cannot be characterized as

22 "an error well understood and comprehended in existing law beyond any possibility for

23 fairminded disagreement."  See Harrington, 131 S. Ct. at 786-87.

24    Accordingly, to the extent Dorton's ineffective assistance claim is based on a failure

25 to object to evidence that the AP-9 had been used in a different shooting and that Wade

26 had been tried for that different shooting, Dorton fails to show he is entitled to habeas

27 relief.

28 //

1      **5. Testimony Concerning Motel Key**

2         At trial, Sgt. Gormley was asked about various items seized from a residence at 324

3  Maine Street in Richmond, a residence Sgt. Gormley testified was "associate[d]" with co-

4  defendant Phelps; Sgt. Gormley, on occasions prior to the search, had met Phelps there

5  and had seen Phelps come and go from that residence.  (See RT 340:9-14.)  During his

6  direct examination, Sgt. Gormley identified various items seized from a bedroom at 324

7  Maine Street (see RT 342:21 - 343:21), which items, according to Sgt. Gormley, included

8  "two motel room keys that were seized from the dresser drawer," one of which was a key

9  "to the Sea Horse Motel" (see RT 343:2-9), located in Richmond (see RT 380:20-28).

10        In his FAP, Dorton contends his counsel should have objected to Gormley's

11 testimony regarding the key to the Sea Horse Motel, on grounds of lack of relevance and

12 as unduly prejudicial.  In particular, Dorton argues, admission of the key was unduly

13 prejudicial because the key "suggested a 'connection' with [Troy] Olsen that it didn't really

14 tend to prove."  (See FAP at P-39:8-10.)

15        Testimony concerning the Sea Horse Motel was provided by Troy Olsen ("Olsen"), a

16 witness called by the prosecution.  Olsen testified that, in February 1993, he was "addicted

17 to crack cocaine," that he purchased crack cocaine in Richmond, and that he owned a

18 Peugeot.  (See RT 463:25 - 464:13.)  Olsen also testified that, on one occasion in

19 February 1993, he purchased crack cocaine from a person he knew as "Mooch" in

20 exchange for allowing Mooch to use the Peugeot, and that, while "Mooch" was using the

21 Peugeot, Olsen stayed at the Sea Horse Motel.  (See RT 464:23 - 464:23, 466:8-12,

22 472:24-28.)  Olsen further testified that the police later returned the Peugeot to Olsen's

23 mother, and that the vehicle appeared to have been damaged by bullets.  (See RT 465:25 -

24 466:4, 472:2-16.)

25        Sgt. Gormley testified that he interviewed Olsen, and that, during the interview, he

26 showed certain photographs to Olsen, at which time Olsen identified a photograph of

27 Mondrell Johnson ("Johnson") as the person he knew as "Mooch" and identified Phelps as

28 a person who was "in the area" when he made his "dope transactions for the car."  (See RT

18

540:3 - 541:4.)  Sgt. Gormley also testified that Johnson, Phelps and Dorton were members of the Third and Maine group.  (See RT 531:15-28, 537:1-7.)

In light of the above-referenced testimony by Olsen and Sgt. Gormley linking Phelps to the car used in the shooting, and evidence that Johnson, Phelps and Dorton all were members of the Third and Maine group, the California Supreme Court reasonably could have found Sgt. Gormley's testimony about the key was relevant as corroborative of Robinson's testimony and not unduly prejudicial, and, consequently, that the failure to object to such evidence did not constitute deficient performance.  See Matylinsky, 577 F.3d at 1094.  Any such finding by the California Supreme Court cannot be characterized as "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  See Harrington, 131 S. Ct. at 786-87.

Accordingly, to the extent Dorton's ineffective assistance claim is based on a failure to object to Sgt. Gormley's testimony regarding the Sea Horse Motel key, Dorton fails to show he is entitled to habeas relief.

### 6. Closing Argument

In his FAP, Dorton argues his trial counsel was ineffective for not objecting to certain statements made by the prosecutor during closing argument, each of which pertained to prosecution witness Robinson, who, as discussed above, testified that he saw the shooting and identified both Dorton and Phelps as being two of the shooters in the Peugeot.

#### a. References to Discovery and Threats

Dorton asserts that during the prosecution's closing argument, the prosecutor referred to facts not in evidence, and that his trial counsel was ineffective in not objecting to such statements.  The statements at issue pertained to threats Robinson reported had been made against him.  Robinson, whose testimony from the second trial was read to the jury in light of his unavailability at the third trial, testified he was in court testifying (in the second trial) only because he had been arrested and brought to court, and that he did not appear at the first trial, even though he had received a subpoena, because of "threats made through phone calls."  (See RT 614:8 - 615:6.)  Robinson further testified that a

19

1  deceased person, also named Jonathan Robinson, and who, according to Robinson, was

2  his "brother" and his "father's son," was killed, and that "when he got killed it was said to

3  [Robinson] that he was the wrong one.  The wrong target."  (See RT 621:17-26.)[18]

4       During the prosecution's closing argument, the prosecutor, commenting on why she

5  had not offered testimony from Robinson in person, stated, "You know, people threatening

6  his life, John Robinson being murdered right after the discovery being given out, maybe not

7  that surprising he wasn't actually here."  (See RT 1246.)  Additionally, in her rebuttal

8  argument, the prosecutor stated, "[T]hree days after Jonathan Robinson was killed, Toddy,

9  the Jonathan Robinson that was killed,[19] three days after that, shortly after the discovery

10 was given out, our John Robinson got a phone call where they were reading from police

11 reports and telling him about video tapes."  (See RT 1310:26 - 311:2.)

12      In his FAP, Dorton argues it was ineffective for his counsel not to object to the

13 above-quoted statements, because, according to Dorton, "[t]here was no testimony at the

14 trial about the date the People gave discovery to the defense, or about people reading

15 police reports or mentioning video tapes to Robinson."  (See FAP at P-39:27 - P-40:1.)

16      Contrary to Dorton's claim, evidence was offered to support the factual assertions

17 made by the prosecution.  In particular, Sgt. Gormley testified that he spoke to Robinson

18 on January 25, 1994, at which time Robinson stated he had received "warnings" on

19 Saturday, January 15, 1994.  (See RT 1048:2-16.)[20]  When Sgt. Gormley was asked what

20 Robinson had told him, Sgt. Gormley testified as follows:  "He said that his friend had told

21

22 [18]The trial court gave the jury a limiting instruction concerning Robinson's testimony
   about threats.  Specifically, the trial court orally "admonished" the jury that such testimony
23 was not being offered "for the truth of the matter stated, but to show the state of mind that
   the witness had at the time he was testifying in the other proceeding [the second trial]."
24 (See RT 615:7-15.)  Dorton has not challenged the trial court's admission of such
   testimony.

25      [19]"Toddy" was the nickname of the Jonathan Robinson who was killed.  (See RT
26 1052:21 - 1053:3.)

27      [20]The testimony was introduced on "cross-examination" of Sgt. Gormley, who was
   recalled as a defense witness and questioned on "direct" by Phelps's counsel as to a
28 payment made by said witness to Robinson for relocation expenses, and other matters
   potentially bearing on Robinson's state of mind.

him there were people looking for him.  That . . . they had read copies of my police reports

to him, and they even quoted him some sections, including being interviewed in the C.I.B.

interview room and videotaped."  (See RT 1048:19-25.)  Sgt. Gormley also testified

"discovery had been made available that Thursday or Friday before he received the

threats."  (See RT 1048:26 - 1049:5.)

In light of the above-referenced testimony from Sgt. Gormley, the California

Supreme Court reasonably could have found an objection to the prosecutor's factual

assertions about when discovery was provided and about the content of a threat made to

Robinson, on the ground that no evidence had been offered to support those assertions,

would have been meritless, and, consequently, that counsel was not ineffective in failing to

make such objection.

Accordingly, to the extent Dorton's ineffective assistance claim is based on a failure

to object to statements made in closing argument that "discovery" had been provided

shortly before Robinson received a threatening call in which references were made to the

content of police reports and to Robinson's having been videotaped, Dorton fails to show

he is entitled to habeas relief.

### b. Reference to Robinson's Demeanor on Videotape

In his FAP, Dorton alleges his counsel should have objected on Sixth Amendment

grounds to the prosecutor's statement in closing argument that the jury, in determining

Robinson's credibility, should consider Robinson's demeanor as it appeared on a videotape

shown to the jury.  The videotape consisted of excerpts from an interview of Robinson

conducted by Sgt. Gormley on the date of Crosby's murder.

During closing argument, the prosecutor identified several "factors" the jury could

consider when determining a witness's credibility (see RT 1245:2-9), one such factor being

//

//

//

//

21

the "[d]emeanor and manner of the witness while testifying" (see RT 1246:11-12).[21]   The

prosecutor acknowledged that Robinson was not "here" for the third trial, his testimony from

the second trial having been read into the record, and then argued, referencing the

videotaped interview, as follows:  "But you got to see the demeanor of [Robinson] within an

hour of the homicide, right after it happened.  And I think all of you will agree that the

demeanor of that witness was not unsure.  He was excited by what had happened, but he

was very, very much completely sure of what he was telling."  (See RT 1246:21-26.)  After

addressing several other factors a jury could consider when determining Robinson's

credibility, the prosecutor summed up her discussion of that issue as follows:  "So when

you look at all of these factors and the other factors, including your review of that tape - -

and do review that videotape.  Look at it again closely.  Judge his demeanor and credibility.

I think you'll find that this testimony alone is enough to convict both defendants."  (See RT

1251:25 - 1252:1.)

       As noted, Dorton claims his counsel should have objected, on Sixth Amendment

grounds, to the above-referenced portions of the prosecution's closing argument.  In

particular, Dorton contends:  "The People argued that the jury should consider Robinson's

---

[21]In discussing such "factors," the prosecutor was referencing the following standard
instruction that had been given to the jury before closing argument:

> In determining the believability of a witness, you may consider anything that
> has a tendency in reason to prove or disprove the truthfulness of the
> testimony of the witness, including but not limited to, any of the following:
> The extent of the opportunity or the ability of the witness to see or hear or otherwise
> become aware of any matter about which the witness has testified;
> The ability of the witness to remember or to communicate any matter about which
> the witness has testified;
> The character and quality of that testimony;
> The demeanor and manner of the witness while testifying;
> The existence or nonexistence of a bias, interest or other motive;
> Evidence of the existence or nonexistence of any fact testified to by the witness;
> The attitude of the witness toward this action or toward the giving of testimony;
> A statement previously made by the witness that is consistent or inconsistent with
> the testimony of that witness;
> The witness' prior conviction of a felony; [and]
> Past criminal conduct of the witness amounting to a misdemeanor.

(See RT 1210:22 - 1211:16); see also CALJIC No. 2.20.

22

1   'demeanor' exhibited on the videotape of the police interview.  This argument deprived

2   Robinson of his Sixth Amendment right to confrontation, since Robinson was never

3   subjected to any cross-examination during the taped interview."  (See FAP at M-12:14-17.)

4          Dorton did not argue to the California Supreme Court, nor has he argued in his

5   federal habeas petition, that the trial court's admission of the videotape violated his Sixth

6   Amendment rights, or that the videotape was otherwise erroneously admitted.[22]  Rather,

7   Dorton's claim is based on the prosecutor's assertedly incorrect reference to the trial court's

8   instruction as applying to statements made out of court.  Dorton has cited no authority,

9   however, holding, or even suggesting, that a valid Sixth Amendment objection could be

10  made in response to a closing argument commenting on the veracity of an out-of-court

11  statement that had been admitted into evidence, and which statement the petitioner has not

12  claimed was improperly admitted.  Under such circumstances, the California Supreme

13  Court reasonably could have found any Sixth Amendment objection made during closing

14  argument would have been meritless, and, consequently, that Dorton's counsel was not

15  ineffective in failing to make such an objection.

16         Accordingly, to the extent Dorton's ineffective assistance claim is based on a failure

17  to raise a Sixth Amendment objection to the prosecution's statement that the jury could

18  consider Robinson's demeanor as was shown on the videotape, Dorton fails to show he is

19  entitled to habeas relief.

20  //

21  //

22  _____

23  [22]During cross-examination, counsel for both Dorton and Phelps asked Robinson
about various statements he had made during his interview with the Richmond Police,
24  apparently in an attempt to show his trial testimony was inconsistent with the statements he
had made during the interview.  (See, e.g., RT 633:12-23, RT 683:15 - 684:4.)  At the
25  prosecution's request, and over the objection of the defense, the trial court agreed to allow
excerpts of the interview to be played for the jury pursuant to § 356 of the California
26  Evidence Code.  See Cal. Evid. Code § 356 ("Where part of an act, declaration,
conversation, or writing is given in evidence by one party, the whole on the same subject
27  may be inquired into by an adverse party; when a letter is read, the answer may be given;
and when a detached act, declaration, conversation, or writing is given in evidence, any
28  other act, declaration, conversation, or writing which is necessary to make it understood
may also be given in evidence.").

23

### c. Vouching

"Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony."  United States v. Necoechea, 986 F.2d 1273, 1276 (9th Cir. 1993).  Dorton argues that the prosecutor's closing argument constituted a personal assurance that Robinson was credible.

In particular, Dorton contends his counsel should have objected when the prosecutor, according to Dorton, "concluded her closing argument by stating that ther[e] is a 'Code of Silence' on the streets and that people like Jonathan Robinson 'don't go to the police . . . unless they are telling the truth.'"  (See FAP at M-12:18-21.)  Dorton, however, takes the prosecutor's remarks out of context.  What the prosecutor argued was as follows:

> And there is absolutely no motive that you can come up, or the defense can come up with, as to why Jonathan Robinson would break that unwritten rule, but that very strong rule, that Code of Silence.  You heard from everyone, even the defense witnesses, people don't go to the police.  They don't go to the police unless they are telling the truth.  Jonathan Robinson, who lived by the law of the land of the defendants, broke their rules.

(See RT 1323:10 - 1324:1.)

The prosecution's argument, read in context, can reasonably be understood as a comment on the evidence given at trial as to when a person would speak to the police, rather than a personal belief by the prosecutor concerning Robinson's veracity.  Moreover, as the Ninth Circuit has observed:  "Because many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the wide range of permissible professional legal conduct."  See Necoechea, 986 F.2d at 1281.  In short, the California Supreme Court's determination of this claim cannot be characterized as an "error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  See Harrington, 131 S. Ct. at 786-87.

Accordingly, to the extent Dorton's ineffective assistance claim is based on a failure to object to the prosecution's statement concerning when a person would speak to the

police, Dorton fails to show he is entitled to habeas relief.

**CONCLUSION**

For the reasons stated above, the First Amended Petition is hereby DENIED.

Further, a certificate of appealability is hereby DENIED, for the reason that defendant has not made a "substantial showing of the denial of a constitutional right."  See 28 U.S.C. § 2253(c)(2); see also Rules Governing Section 2254 Proceedings Rule 11(a) (providing district court must issue or deny certificate of appealability when entering final order adverse to defendant).

**IT IS SO ORDERED.**

Dated:  November 18, 2011

MAXINE M. CHESNEY
United States District Judge